# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# PEORIA DIVISION

JESSICA COYLE,

    Plaintiff,

  v.

Peoria Police Officers ROSS HARR PP1285, KYLE CRUZ PP1270, and the CITY OF PEORIA,

    Defendants,

Case No. 24-cv-1158

*Jury demanded.*

## COMPLAINT AT LAW

NOW COMES Plaintiff JESSICA COYLE, by her attorney, LAW OFFICE OF JORDAN MARSH LLC, and complaining of the defendants, ROSS HARR, KYLE CRUZ, and the CITY OF PEORIA, states the following:

### JURISDICTION AND VENUE

1. This action arises under the Constitution of the United States, particularly the Eighth and Fourteenth Amendments to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

2. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

1

3. This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims. Venue is proper under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

## PARTIES

4. At all times relevant herein, Plaintiff JESSICA COYLE ("Jessica") was a resident of the County of Peoria, State of Illinois.

5. Defendant HARR is sued in his individual capacity and was at all times relevant, a sworn police officer employed by Defendant CITY OF PEORIA, and was acting within the scope of his agency, service and/or employment with the CITY OF PEORIA, and was acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6. Defendant CRUZ is sued in his individual capacity and was at all times relevant, a sworn police officer employed by Defendant CITY OF PEORIA, and was acting within the scope of his agency, service and/or employment with the CITY OF PEORIA, and was acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

7. At all times relevant, Defendant CITY OF PEORIA was a government entity operating within the State of Illinois and was responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, the City of Peoria was the employer of Defendants HARR and CRUZ.

## **FACTUAL ALLEGATIONS**

8. On December 10, 2023, at around 5:20 in the morning, Jessica called the Peoria Police Department non-emergency phone number to request assistance in removing her husband from the house.

9. At around 5:26 a.m., Officers Harr and Cruz arrived at Jessica's home. Jessica was waiting outside her house in the driveway.

10. The officers asked Jessica about her dogs, and Jessica explained that her male dog was in his kennel, and a female dog was inside the room with her husband.

11. When the officers asked Jessica if the female dog was a mean dog, she said her dogs were not mean, but they did not have a lot of experience around other people.

12. During the officers' questioning of Jessica, both officers were standing next to each other in the driveway, and Jessica was facing them further up the driveway.

13. Defendant Cruz was standing next to Defendant Harr, immediately to Harr's right.

14. As the officers questioned Jessica, one of her dogs, named Sunshine, ran out from behind the house.

15. As soon as they saw Sunshine, Defendants Harr and Cruz panicked.

16. Cruz, who had been standing next to Harr, ran back toward the street.

17. Both officers immediately drew their weapons as Sunshine ran from the driveway next to the house onto the front lawn, away from the officers.

18. At this point, Cruz had sprinted to the apron of the sidewalk, in front of the squad car, which was parked perpendicular to the driveway, partially blocking the driveway. Harr was further up the driveway.

19. As Sunshine ran toward the sidewalk, Harr tracked her with his firearm and began firing in the direction of Sunshine and Cruz.

20. Cruz, who was generally facing the house, fired also.

21. Jessica was on the front lawn in front of the house.

22. The officers fired at Sunshine as she ran between them along the sidewalk.

23. Cruz fired down at Sunshine, but in the general direction of the house, where Jessica was standing.

24. The officers continued firing as Sunshine ran past them and away from them.

25. "F**k, Ross, you shot me, goddammit. What the f**k!", yelled Cruz, as Sunshine lay on the sidewalk whimpering.

26. "Ross, you f**kin' shot me!" said Cruz again, as he limped around the parkway.

27. Harr responded, "I didn't shoot you."

28. Cruz said, "Yes you f**kin' did!"

29. Harr said, "You probably got a ricochet", as he continued to point his weapon at Sunshine, who lay helpless and whimpering on the sidewalk.

30. As Sunshine lay dying, the officers continued to argue about whether Harr had shot Cruz.

31. As the officers argued, Cruz said, "You watch out, that dog's coming back".

32. Harr said, "It's fine, it's not moving".

33. Sunshine, who was dying, had not moved since she first collapsed on the sidewalk.

34. "Give me a f**kin' tourniquet, Ross," said Cruz.

35. As Harr examined Cruz's bloody lower leg, he said, "You're not shot, you got a ricochet. You're fine."

36. As this was happening, Jessica, yelled that she was shot.

37. Harr asked Jessica, who was clearly bleeding from the leg, "Where did the blood on your hand come from?"

38. Jessica responded, "Probably my thigh right here where I got shot!"

39. ""Who shot you?" asked Harr, who remained standing at a distance from Jessica.

40. Other officers responded to the scene.

41. A responding officer approached Harr and appeared to make eye contact with him without saying anything, then appeared to do something with his bodycamera. At that point, Harr deactivated the audio on his bodycamera.

42. The remaining nine minutes of Harr's bodycamera proceeded without audio.

43. The silent bodycamera footage shows Harr speaking with responding officers, gesturing and pointing to the house, presumably discussing the facts of the shooting.

44. The Illinois State Police arrived at Jessica's house and helped her by putting her in a tourniquet. Jessica was later taken in an ambulance to Saint Francis Hospital.

45. At no time did Sunshine run directly toward either officer.

46. At no time did Sunshine attack or appear to attack either officer.

47. At no time did Sunshine engage in actions that placed either officer in reasonable fear of harm, let alone great bodily harm.

48. After the incident, the officers authored and submitted falsified police reports.

49. One summary report stated that the defendant officers "encountered a female outside the residence and a loose, vicious dog. Once on scene, the dog came at the officers and in turn, the officers discharged their firearms at the dog. The dog was killed by the officers."

5

50. This report makes no mention of the shooting of Jessica or Defendant Cruz.

51. Contrary to the summary report, Defendant Harr never claimed in his report that Sunshine came at him. Yet he falsely told a responding officer that "a dog had come at him and Ofc Cruz, they had both fired their firearms at the dog."

52. Harr told this officer that "the dog had run from the street and he had fired towards the street as he was standing in the driveway, facing west."

53. Harr's statement was false. The dog had not run from the street.

54. Harr wrote in his report:

> During this time speaking with Jessica the three of us were standing in the drive way of the residence. Suddenly a white Pit Bull exited the back yard via a [sic] entrance point behind the home and South of the drive way. During this time I was standing in the middle of the drive way on the south side of the drive way. The female was up the drive way East of me near where the Pit Bull had appeared. Ofc. Cruz was at the bottom of the drive way area.

55. Harr's statement about Cruz's position was false. When Sunshine appeared, Cruz was standing to the right of Harr, nowhere near Sunshine, who was running away from the officers to Harr's left.

56. As Sunshine ran onto the lawn and toward the street away from the officers in a southwest direction, Cruz inexplicably sprinted south toward the street in the same direction Sunshine was heading, instead of staying where he was.

6



**Cruz's bodycamera footage the moment before Sunshine appeared.
Harr can be seen to Cruz's left.**



**Harr's bodycamera footage three seconds after Sunshine first appeared. At this point, Cruz has begun running toward the street in roughly the same direction Sunshine is heading.**

7


**Harr's bodycamera footage four seconds after Sunshine first appeared.**

57. Harr wrote in his report:

    The Pit Bull began to quicken its approach towards Ofc. Cruz. At this point Ofc. Cruz and myself had already un-holstered our side arms and had aimed them at the dog. The Pit Bull continued towards Cruz. Ofc. Cruz began to step backwards while the dog continued towards him quickening its pace in an aggressive manner as if it was going to attack Ofc. Cruz. Ofc. Cruz began to yell commands in reference to the owner gaining control of her dog. At this time I deemed that there was no time for Ofc. Cruz to get to safety and that he was in danger of being bitten by the Pit Bull. Given the dogs pace towards Ofc. Cruz, and with the comment Jessica had mentioned earlier about not knowing if her dog was aggressive towards people or not and with the safety of a fellow officer in mind I deduced that I needed to engage the animal to prevent injury to Ofc. Cruz.

58. Harr's hyperbolic account is refuted by the bodycamera footage.

59. Sunshine never quickened her approach toward Cruz.

60. Sunshine never approached Cruz at all.

61. The only reason Cruz was ever in Sunshine's vicinity was because Cruz ran from the driveway to where Sunshine was heading.

62. Jessica never told the officers her dogs were aggressive. In fact, she said they were not mean.

63. Contrary to Harr's description, Sunshine never appeared as if she was going to attack Cruz, and never ran directly toward Cruz.

64. Cruz wrote in his report that "[a] As this pitbull approached us it began growling/barking in a very aggressive manner making me feel it was going to attack."

65. This is false. Bodycamera footage confirms the only time Sunshine barked was the split-second before the officers opened fire on her, as she ran between them.

66. Cruz wrote, "The pitbull then charged me aggressively as I backed up down the driveway toward the street. It became very clear to me this dog was going to attack me. To prevent receiving bodily harm from the dog, I then drew my department approved Glock 19, aimed at the dog and fired what I believe was 2 rounds."

67. This, too, is false. Sunshine never charged Cruz at all. Nor did she appear intent on attacking Cruz or anyone.

68. Harr's report confirms that the officers drew their weapons and pointed them at Sunshine well before Sunshine was in the vicinity of Cruz.

9



**Harr's Bodycamera footage showing Sunshine running between the officers.**



**Harr's Bodycamera footage showing Sunshine running between and away from the officers, who fire at Sunshine while facing each other.**



**Harr's Bodycamera footage, showing Harr firing at Sunshine as she tries to run away from the officers.**



**Cruz's bodycamera footage, showing Sunshine running parallel to Cruz and away from the officers as they fire.**

69. As demonstrated by the sequence of bodycamera images above, Sunshine was never running at either officer. She was running between them – and away from them – as they fired.

70. The bodycamera footage alone demonstrates that there was no legal justification for either officer to fire his weapon.

71. Apart from the lack of justification for firing their weapons, the manner in which the officers fired their weapons – facing each other and facing a civilian, resulting in "friendly fire" injuries to an officer and a civilian – was utterly incompetent, objectively unreasonable, and criminally reckless.

## COUNT I – FEDERAL LAW CLAIM
## EXCESSIVE FORCE
## DEFENDANTS HARR AND CRUZ

72. Each paragraph of this Complaint is incorporated as if restated fully herein.

73. As a result of Defendant Officers' reckless, unreasonable, and unnecessary actions in shooting and killing a dog who presented no threat to either officer, one officer and one innocent civilian suffered gunshot wounds and required emergency medical treatment.

74. The force used by Defendant Officers as set forth herein was excessive, unnecessary, and objectively unreasonable.

75. Neither officer had any basis to believe he was in imminent fear of death or great bodily harm.

76. Sunshine did nothing to justify Harr and Cruz's use of deadly force.

77. Sunshine did not threaten, attack, or otherwise place Harr, Cruz or anyone else in imminent fear of harm.

78. Jessica did nothing to justify the defendants' use of deadly force.

79. The actions of Defendants Harr and Cruz constituted unreasonable, unjustifiable, and excessive force, violating Jessica's rights under the Fourth Amendment to the United States Constitution.

80. As a direct and proximate result of Defendants Harr and Cruz's conduct, Jessica suffered extreme and severe emotional trauma, physical and mental pain and suffering, anxiety, and the loss of her beloved dog, and will continue to suffer many of these conditions in the future.

<div style="text-align:center">

**COUNT II – FEDERAL LAW CLAIM
ILLEGAL SEIZURE
DEFENDANTS HARR AND CRUZ**

</div>

81. Each paragraph of this Complaint is incorporated as if restated fully herein.

82. The unlawful seizure of Jessica's dog, Sunshine, as detailed above, violated Jessica's rights under the Fourth Amendment to the United States Constitution.

83. At all times relevant, Defendants Harr and Cruz were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois, and within the scope of their employment as Peoria police officers.

84. As a direct and proximate result of Defendants Harr and Cruz's conduct, Jessica suffered extreme and severe emotional trauma, physical and mental pain and suffering, anxiety, and the loss of her beloved dog, and will continue to suffer many of these conditions in the future.

<div style="text-align:center">

**COUNT III – STATE LAW CLAIM
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
DEFENDANTS CITY OF PEORIA, HARR, AND CRUZ**

</div>

85. Each paragraph of this Complaint is incorporated as if restated fully herein.

86. Defendants Harr and Cruz, and Defendant City of Peoria, by and through its agents Defendant Harr and Cruz, engaged in conduct that was extreme and outrageous, with knowledge

that their actions were likely to cause severe emotional distress to Jessica, and did in fact cause severe emotional distress to Jessica.

87. As a direct and proximate result of Defendants' conduct, Jessica suffered extreme and severe emotional trauma, physical and mental pain and suffering, anxiety, and the loss of her beloved dog, and will continue to suffer many of these conditions in the future.

<div style="text-align:center">

**COUNT IV – STATE LAW CLAIM**
**BATTERY**
**DEFENDANTS CITY OF PEORIA, HARR, AND CRUZ**

</div>

88. Each paragraph of this Complaint is incorporated as if restated fully herein.

89. Defendants Harr and Cruz, and Defendant City of Peoria, by and through its agents Defendants Harr and Cruz, knowingly and without legal justification or permission, harmfully and/or offensively made physical contact with Jessica, committing battery under Illinois law.

90. As a direct and proximate result of Defendants' conduct, Jessica suffered extreme and severe emotional trauma, physical and mental pain and suffering, anxiety, and will continue to suffer many of these conditions in the future.

<div style="text-align:center">

**COUNT V – STATE LAW CLAIM**
**IDEMNIFICATION**
**DEFENDANT CITY OF PEORIA**

</div>

91. Each paragraph of this Complaint is incorporated as if restated fully herein.

92. At all relevant times, City of Peoria was the employer of Defendants Harr and Cruz.

93. Defendants Harr and Cruz committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Peoria.

94. Illinois law provides that governmental entities are directed to pay any tort judgment for any damages for which employees are liable within the scope of their employment activities.

95. Should Defendants Harr and Cruz be found liable on one or more of the claims set forth above, Plaintiff Jessica Coyle demands, pursuant to Illinois law, that their employer, Defendant City of Peoria, be found liable for any judgment plaintiff obtains against Defendants Harr and Cruz, as well as attorney's fees and costs awarded, and for any additional relief this Court deems just and proper.

### PRAYER OF RELIEF (ALL COUNTS)

For the foregoing reasons, the Plaintiff JESSICA COYLE, prays for judgment against in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

### JURY DEMAND

The Plaintiff JESSICA COYLE, requests a trial by jury.

**DATED:** April 17, 2024

Respectfully submitted,

JESSICA COYLE

/s/ Jordan Marsh
*Attorney for the Plaintiff*

**LAW OFFICE OF JORDAN MARSH LLC**
5 Revere drive Suite 200
Northbrook, IL 60062
(224) 220-9000
jordan@jmarshlaw.com

15