IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JESSICA COYLE,
    Plaintiff,

v.

Peoria Police Officers ROSS HARR
PP1285, KYLE CRUZ PP1270, and
the CITY OF PEORIA,
    Defendants.

Case No. 1:24-cv-01158-JEH-RLH

**Order**

Now before the Court is the Defendants Kyle Cruz, Ross Harr, and the City of Peoria's Motion for Summary Judgment (D. 21), Plaintiff Jessica Coyle's Response (D. 24) thereto, and the Defendants' Reply (D. 25).[1]  For the reasons set forth *infra*, the Defendants' Motion is GRANTED.

**I**

On April 17, 2024, Plaintiff Jessica Coyle filed her original complaint against Defendants Ross Harr, Kyle Cruz, and the City of Peoria, Illinois.  Defendants Harr and Cruz were employed as sworn police officers by the City of Peoria at all relevant times and were sued in their individual capacities.  Plaintiff Coyle filed her First Amended Complaint at Law (D. 18) on December 16, 2024 alleging excessive force (Count I) by Defendants Harr and Cruz, illegal seizure (Count II) by them, willful and wanton conduct (Count III) by all three Defendants, and battery (Count IV) by all three Defendants.  Plaintiff Coyle also pursued a claim for indemnification (Count V) against Defendant City of Peoria.  Specifically, the

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

1

Plaintiff complained of an incident that began with her December 10, 2023 call to the Peoria Police Department around 5:20 in the morning to request assistance in removing her husband from the house and ended with her dog, Sunshine, dead from gunshots inflicted by Defendants Harr and Cruz, with Officer Cruz (with a bloodied lower leg) yelling Harr had shot him, and with Coyle (with a bloodied thigh) yelling that she had been shot.

## II

The undisputed facts are as follows.[2] Defendants Harr and Cruz were at all relevant times City of Peoria police officers acting within the scope of their employment and under "color of law[]", while Defendant City of Peoria was at all relevant times a municipal corporation operating under the laws of Illinois and the employer of Officers Harr and Cruz. Plaintiff Coyle called the Peoria 911 emergency line on December 10, 2023 at around 5:20 a.m. because she "needed some help" getting her husband out of her house. Defs.' Mot. Summ. J. Ex. B (PEORIA 000265 (911 call) filed conventionally). Defendants Harr and Cruz were dispatched to Coyle's house on Griswold Street and were alerted by their dispatcher that "there's three loose pit bulls out front" of the residence. Defs.' Mot. Summ. J. Ex. D (PEORIA 000266 (radio dispatch) filed conventionally). At the time of the incident, Plaintiff Coyle's dog Sunshine weighed about 80 pounds and was less than two years old. Both officers had body cameras which captured video and audio of the incident from the time they arrived on scene until minutes after they had shot and killed Plaintiff Coyle's pit bull Sunshine and were no longer interacting with Coyle.

Prior to the incident, Defendant Cruz had been twice bitten by a pit bull off-duty, and one of those bites required stitches. While on duty, Cruz had seen at

---

[2] Taken from both Defendants' and the Plaintiff's briefs.

least two people taken to the hospital due to injuries from a pit bull. These experiences impacted his perception of a possible threat from Plaintiff Coyle's pit bull. At the time of the incident, Defendant Cruz believed based on his personal and professional experience that some, but not all, dogs can be aggressive and dangerous, and that while some breeds are more likely to be dangerous, not all pit bulls are dangerous. At the time of the incident, Officer Harr co-owned a rescue pit bull with his girlfriend, which he does not consider to be a dangerous dog, but that dog had bitten him by accident and left scars. At the time of the incident, Defendant Harr believed, based on his own experience of being bitten by his dog by accident, and based on news media reports, that pit bulls can be strong and deadly, especially if the dog intends to cause harm.

  The Peoria Police Department's Use of Force policy does not expressly mention dogs, but the policy expressly says that officers may always "defend themselves with and others with as much force as is objectively reasonable based on the totality of the circumstances," and the Department position is that the catch-call section applies to use of force against animals. At the time of the incident, the Peoria Police Department had not provided formalized training for officers regarding deadly force against animals since Defendants Cruz and Harr joined the Department. However, dealing with and using force against animals was a subject typically covered by field training officers working with new officers. Of the 16 previous incidents in the five years before involving Peoria Police Department officers shooting and killing dogs, one involved Defendant Cruz. In March 2023, he shot and killed one pit bull which was attacking another pit bull at the direct instructions of an animal control officer. That incident and the one at issue in this case are the only times Cruz had used deadly force as a police officer.

  Defendants Cruz and Harr arrived separately at Plaintiff Coyle's house on Griswold Street at 5:26 a.m. on December 10, 2023. Within a second, they heard

loud barking and Harr said, "make sure those dogs are put up." Defs.' Mot. Summ. J. Ex. E (PEORIA 000020 (Cruz video) filed conventionally); Ex. F (PEORIA 000023 (Harr video) filed conventionally). Harr told Plaintiff Coyle to "make sure they are not coming out", and Coyle said "one is running loose. I don't know where he is at right now, or when he is going to jump back up on us." Defs.' Mot. Summ. J. Ex. E. Harr then asked, "is he mean?", and Coyle responded, "I've never had him around people." *Id.* Coyle then walked off her front porch and began talking about her husband while both Cruz and Harr waited at the bottom of the driveway. When Harr asked if the dogs were "kenneled inside the house[]", Coyle responded two dogs were in the house but did not mention her third dog. *Id.* Harr asked the question as he and Cruz began walking up the driveway and as Coyle talked about her issues with her husband. When an officer again asked if the female dog inside the house was mean, Coyle reiterated that "none of my dogs are mean," but also reiterated that the dogs were not used to being around other people and "the dogs only know us." *Id.* Coyle added that her "boy that's running around" was only two years old and "has not had training enough to know." *Id.* Plaintiff Coyle never told the officers that Sunshine had ever attacked or bitten anyone. Defendant Cruz's concern about the potential danger from the pit bull Sunshine was increased when he heard that the dog had not been around strangers and could "jump out" or "jump up" on the officers. Defs.' Mot. Summ. J. Ex. G Cruz Dep. (D. 21-7 at ECF p. 36). Plaintiff Coyle continued to talk with Defendants Cruz and Harr for about two minutes about her husband's condition and behavior.

      Defendant Cruz began backpedaling several steps to just behind the sidewalk the instant Sunshine appeared from behind the house, and Cruz drew his weapon while he was backpedaling. Within about a second of Sunshine appearing, Defendant Harr stepped to the side. For the first one to two seconds, Sunshine ran down the driveway towards Coyle, Harr, and Cruz and then curved

to its right upon onto the lawn in a northwesterly direction and diagonally away from all three people. Sunshine was running, not sprinting. Cruz backpedaled to increase distance between himself and Sunshine, which he had done to avoid needing to use force with apparently aggressive dogs in the past. Sunshine leapt off the ledge[3] separating the lawn from the sidewalk. Both Cruz and Harr perceived the noise Sunshine made at that time as "not friendly." Defs.' Mot. Summ. J. Ex. C Harr Dep. (D. 21-3 at ECF p. 20); Ex. G Cruz Dep. (D. 21-7 at ECF p. 37). Less than a second after Sunshine leapt off the wall, both Cruz and Harr fired shots, with a total of four shots being fired. Both officers were pointing their guns angled downward toward Sunshine when the shots were fired. Sunshine collapsed on the sidewalk a few feet past the officers and died shortly thereafter. The only audible sounds from Sunshine's mouth from the time he appeared until the time he was shot was a brief bark a split second before he was shot and whimpering as he laid dying on the sidewalk.

      Only five seconds passed from the time Sunshine first appeared until the first shot was fired, and all shots were fired in less than two seconds. Sunshine was running from the time the dog appeared until the time the first shot was fired. Defendant Cruz was struck in the leg by two ricochet fragments from one of the shots. Plaintiff Coyle was struck in the upper thigh by a ricochet or fragment from one of the shots. While the possibility of a ricochet is higher if an officer is firing a gun with a concrete backdrop, as opposed to a softer surface such as grass, the path of any particular ricochet cannot be predicted with a high degree of certainty.

      Within a few minutes, numerous other police officers arrived, including on-scene supervisor, Sergeant Richards, with whom Defendant Harr spoke about the incident. Other responding officers put a tourniquet on Plaintiff Coyle's leg and

---

[3] The Defendants also refer to the ledge as a wall. Defs.' M. Summ. J. (D. 21 at ECF pp. 9-10).

called for an ambulance, and Coyle was ultimately taken to the hospital via ambulance where she was treated and released later that day. She had two follow-up appointments later in December 2023, and in November 2024, the fragment was removed.

### III

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue; she "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). However, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be

evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252.

Here, because both Harr and Cruz captured video and audio of the incident on their body cameras, the Court remains mindful that it need not adopt a version of the facts which is blatantly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Pryor v. Corrigan*, 124 F.4th 475, 483 (7th Cir. 2024) (stating that "when video firmly settles a factual issue, we will not indulge stories clearly contradicted by the footage because there is no genuine factual dispute.") (quoting *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021)).

### A

The Defendants first argue that well-settled Fourth Amendment principles of reasonableness govern the officers' shooting of Coyle's dog Sunshine such that they are entitled to summary judgment on the Plaintiff's claims of excessive force and illegal seizure. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) (explaining the "Fourth Amendment's prohibition against unreasonable seizures of the person" is one of "two primary sources of constitutional protection against physically abusive governmental conduct."); *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) ("Every circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment."). The *Graham* court made clear that all claims that law enforcement officers used excessive force in the course of a seizure "should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . .". 490 U.S. at 395. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397.

1

The Defendants contend that the facts on video and the relevant law compel summary judgment for Defendants Harr and Cruz for three main reasons: 1) Harr and Cruz were told the dog in question was a pit bull; 2) Plaintiff Coyle told the officers she did not know where the dog was, when it would "jump back up on us," and that she had not had the dog around strangers; and 3) Sunshine's behavior as shown in the video. Plaintiff Coyle, however, argues material questions of fact preclude summary judgment, namely, that: Sunshine growled and barked are contradicted by the video evidence, by the Defendants themselves, and by each other; the Defendants' claims that Sunshine ran toward both officers is contradicted by the video evidence; and the Defendants' claim that Sunshine ran directly at Cruz is contradicted by the video evidence and by Cruz's own testimony. Plaintiff Coyle further argues that there is a question of fact as to whether Cruz recklessly created the need for the officers to use deadly force, and "be careful" does not mean "shoot my dog".

The undisputed evidence includes Harr and Cruz being alerted by their dispatcher before they arrived on the scene that there were three loose pit bulls at Coyle's residence, and they were alerted by Coyle at the time they arrived at her residence that one of the pit bulls (Sunshine) was running loose and Coyle did not know when he would "jump back up on us." Defs.' Mot. Summ. J. Ex. E (Cruz video at 05:26:35-40). Also undisputed are Coyle's responses to the officers that she never had Sunshine around people, her reiteration that her dogs were not used to being around other people, that the dogs only knew her and her husband, and that Sunshine was only two years old and had not had training enough to know how the dog would be around other people (mean or not). Moreover, Cruz had

previously been bitten twice by a pit bull and one bite required stitches. Harr owned a pit bull and based on his own experience and news media reports, he knew that that pit bulls can be strong and deadly.

Coupled with those undisputed facts are the video and audio of the incident. The video shows Sunshine appear from behind Coyle's residence running down the driveway toward Coyle, Harr, and Cruz. Sunshine then continues running away from them momentarily. Sunshine then turns in the direction of Harr and Cruz, all the while running, and departs the elevated yard toward Cruz onto the sidewalk immediately in front of Cruz and behind Harr, at which point the officers both shoot toward Sunshine. Sunshine then proceeds past Cruz on the sidewalk and collapses, having been shot. The still images taken from the officers' body cameras (provided by the parties) show Sunshine directly center of Cruz's body camera as depicted by the camera as the dog runs toward the sidewalk and departing the yard down toward Cruz and running in his direction as depicted on Harr's body camera. *See* Defs.' Mot. Summ. J. Exs. I, J, L (D. 21-9 at ECF p. 1, D. 21-10 at ECF p. 1, & D. 21-12 at ECF p. 1)); Pl.'s Resp. (D. 24-5 at ECF pp. 1-7 & D. 24-6 at ECF pp. 1-10). The Court's own review of the video, pausing the video throughout, shows Sunshine appearing to be headed directly toward Cruz as Sunshine departs the yard toward the sidewalk.

In spite of all the Plaintiff's protestations that there remain triable questions of fact presented in the video, the video of the incident instead eviscerates any factual disputes in this case. *See Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) ("Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts."). This is particularly so when coupled with dispatch's alert to Cruz and Harr that three pit bulls were running loose at the residence, given Coyle's answer to the officers' questions about Sunshine, and given the officers'

9

experience with and general knowledge of pit bulls. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Here, the dog was a pit bull, not, for instance, a chihuahua. *See Altman v. City of High Point, N.C.*, 330 F.3d 194, 206 (4th Cir. 2003) (stating "pit bulls, like Rottweilers, are a dangerous breed of dog[]"); *Brooker v. Abate*, No. 18 C 50111, 2020 WL 5819872, at *7-8 (N.D. Ill. Sep. 30, 2020) (finding the defendants were entitled to summary judgment on the plaintiff's Fourth Amendment claim related to the seizure of his pit bull where the court was unpersuaded by the plaintiff's argument that the shooting of the pit bull was avoidable); *and Azurdia v. City of New York*, No. 18-cv-04189-ARR-PK, 2019 WL 1406647, at *8 (E.D.N.Y. Mar. 28, 2019) ("An officer confronted by a dog whose breed is known for fighting, aggressive behavior[] has a right to remain on guard . . .") (internal citation omitted). As the Defendants argue, it is true that breed alone does not make a dog dangerous, but it is not unreasonable for police officers to evaluate an 80-pound pit bull or a Doberman differently from a 25-pound corgi or a dachshund. While there are discrepancies between the officers and the video, between Cruz and Harr, and between various statements made by each officer at various times as to whether Sunshine was barking and growling throughout the encounter, those discrepancies do not present a material factual dispute significant enough to overcome what the video otherwise clearly depicts. Again, the Court is to consider the facts and circumstances the officers confronted. Here, the parties do not dispute Sunshine made *a* noise a split second before the officers opened fired – a pit bull whose owner had just stated she did not know when the dog would "jump back up on us", who stated the dog had only ever been around her and her husband, who stated the dog had not had enough training to know how it would

be around other people – and who made the noise while running in the direction of Defendant Cruz.

Nor is the video "not wholly clear" as to Sunshine's trajectory in the moments before the officers opened fire to preclude summary judgment. *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) ("A conclusive video allows a court to know what happened and decide the legal consequences, but a video that is ambiguous or not wholly clear can be relied on only for those facts that can be established with confidence and beyond reasonable question."). The Plaintiff argues that: a reasonable jury could conclude Sunshine did not charge anyone aggressively; the video is "crystal clear" that at the time Harr and Cruz fired at Sunshine, the dog was not posing a threat to anyone; and still images from both officers' cameras "clearly show that Sunshine is on the sidewalk running perpendicular to the officers, and not even remotely toward either officer, at the time they are firing." Pl.'s Resp. (D. 24 at ECF p. 25). For the third time, the question is whether the officers' actions were "objectively reasonable" in light of the facts and circumstances that actually confronted them. Given her argument, the Plaintiff would have the officers engage in instantaneous geometry before their actions could ever be considered objectively reasonable.

Her argument falls flat where "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. As the Defendants counter, it is not the law that every police officer must wait to see if a running pit bull unaccustomed to strangers will veer away in the last second rather than attack. *Compare Viilo*, 547 F.3d at 710 ("the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable[]"). The real time video

11

shows Sunshine's general direction and speed. The Court must judge the depicted sequence of events from the perspective of a reasonable officer on the scene, rather than with consideration given to the Defendants Cruz's and Harr's hindsight. This is not a case for a jury. *See Smith*, 10 F.4th 725 at 730 ("A conclusive video allows a court to know what happened and decide the legal consequences[.]") (quoting *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019)). At his deposition, Defendant Cruz explained at approximately the time Sunshine departed from the wall, Cruz feared serious bodily harm because the dog was coming in his direction, the dog was still coming towards him even after he backed up to create distance, he had been bitten by a pit bull and had seen others suffer the same fate, the dog barked, and he had been told the dog was not used to being around strangers and might "jump out on us". Defs.' Mot. Summ. J. Ex. G Cruz Dep. (D. 21-7 at ECF pp. 30, 36). At Defendant Harr's deposition, he similarly testified, stating he feared the dog would inflict serious bodily harm on Cruz because of the dog's speed, its bark or "woof" just before the shot, Plaintiff Coyle's statements about her dog and its lack of familiarity with strangers, and the fact the dog was going towards Cruz. *Id*. at Ex. C Harr Dep. (D. 21-3 at ECF pp. 20-21).

The Plaintiff overly relies on *Kailin v. Village of Gurnee*. In that case, a police officer was called to the plaintiffs' home, and six seconds after the plaintiff opened the door, the responding police officer shot the plaintiffs' dog on their neighbor's lawn. *Kailin*, 77 F.4th at 477. The officer had his body camera on, but did not turn on the audio. *Id*. at 482. The plaintiffs claimed, among other thing, illegal seizure under 42 U.S.C. § 1983 (West) against the defendant responding officer. *Id*. The Seventh Circuit explained the case was "not the rare case where the video definitively demonstrates what occurred[]" where there was "no audio that could reveal whether [the dog] was growling or barking as [the responding officer] alleged[]" and where the entire video of the critical event lasts a mere six seconds

and it is disputable whether the dog can be seen at any time in the video until she has been shot. *Id*. at 482. Here, to the contrary, the video depicts all of the time Sunshine was present with Coyle and Defendants Cruz and Harr and includes audio of the entire incident. Sunshine *did* make a noise which the audio captured a split second before the first shot, and that noise must be considered in the context of all else in this case. As the Defendants put it, Plaintiff Coyle's bark/growl distinction is immaterial semantic quibble. To further distinguish *Kailin*, nothing was mentioned as to the dog's breed in that case nor whether the responding officer was told anything about the dog in advance of its appearance.

### 2

Plaintiff Coyle argues there is a question of fact as to whether Defendant Cruz recklessly created the need for him and Harr to use deadly force. She cites *Estate of Starks v. Enyart* wherein the Seventh Circuit stated, "Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force." 5 F.3d 230, 234 (7th Cir. 1993). Coyle insists Defendant Cruz acted recklessly and unreasonably in backpedaling in a western direction after seeing Sunshine running in that same direction with no indication that he would stop.

The Plaintiff does not dispute that Cruz backpedaled to increase distance between himself and Sunshine, a move he had done in the past to avoid needing to use force with apparently aggressive dogs in the past. Such an obviously split-second, reasonable judgment is not the kind of unreasonable action which created a physically threatening situation in *Estate of Starks*; attempting to create distance between a swiftly approaching unfamiliar pit bull by turning and moving away from it and jumping in front of an accelerating car stand in stark contrast. *Estate of Starks*, 5 F.3d at 232. The Plaintiff has the benefit of hindsight to make such an argument, and so the argument fails in the Fourth Amendment use of force

context. *See Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994) ("We do not return to the prior segments of the event and, in light of hindsight, reconsider whether the prior police decisions were correct. Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred."); *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002) ("When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them."); *see also Gysan v. Francisko*, 965 F.3d 567, 570 (7th Cir. 2020) ("*Los Angeles v. Mendez*, --- U.S. ----, 137 S. Ct. 1539, 198 L. Ed. 2d 52 (2017), holds that officers who make errors that lead to a dangerous situation retain the ability to defend themselves."). Coyle's argument that "be careful" does not mean "shoot my dog" similarly relies on the benefit of hindsight, and it is far from determinative given all of the undisputed facts which make up the full context of the December 10, 2023 incident.

The Court's analysis is unchanged by the fact of Plaintiff Coyle's own injury caused by a bullet fragment or ricochet. "[T]he Fourth Amendment addresses 'misuse of power[]' . . . not the accidental effects of otherwise lawful government conduct." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (quoting *Byars v. U.S.*, 273 U.S. 28, 33 (1927)); *see also Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) (stating "[A] court asks whether the force used was reasonable, not whether things turned out badly."). As in *Brandon v. Village of Maywood*, 157 F. Supp. 2d 917 (N.D. Ill. 2001), where the plaintiff was accidentally shot in the leg when police officers shot at a dog and the court held there was no recourse under the Fourth Amendment, the same outcome is warranted here in light of the undisputed facts. *Id*. at 924. "[I]t is not enough that [Cruz and Harr] intended to fire their guns, they must have intended to hit [Coyle] for [her] injury to constitute a seizure for Fourth

14

Amendment purposes." *Id*. at 925. The Plaintiff points to no evidence that Defendants Cruz and Harr intended to hit her.

Because the Defendants are entitled to summary judgment on the merits of the Plaintiff's Fourth Amendment claims, the Court does not reach the question of whether the Defendants are entitled to qualified immunity.

## B

28 U.S.C. § 1367 provides a district court "*may* decline to exercise supplemental jurisdiction over" state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C.A. § 1367(c)(3) (West) (emphasis added). Here, the Court exercises its discretion to retain jurisdiction over the Plaintiff's remaining state law claims in the interests of judicial economy, convenience, and fairness. *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (noting the general rule is for a district court to relinquish jurisdiction over pendent state-law claims rather than resolve them on the merits when all federal claims are dismissed before trial, though "[t]here are . . . unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits."). The parties have litigated the Plaintiff's intertwined claims of illegal seizure, excessive force, willful and wanton conduct, and battery in this case since it was filed in April 2024. They fully engaged in discovery as to the Plaintiff's First Amended Complaint, and they proceeded through summary judgment briefing. To relinquish jurisdiction over the state law claims at this time would cause a significant duplication of effort and permit a multiplicity of litigation. *See id.* (identifying occasions for retaining state-law claims). The following illustrates why this is so.

The difficulties of seeking "a determination that conduct which is a reasonable response under the Fourth Amendment" can nevertheless "constitute

15

willful and wanton conduct under state law[]" are apparent. *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1013 (7th Cir. 2006). Thus, Plaintiff Coyle's willful and wanton claim pursuant to Illinois law against Defendants Harr, Cruz, and the City of Peoria fails given the Defendants are entitled to summary judgment on the Plaintiff's Fourth Amendment claims. Similarly, Plaintiff Coyle's battery claim under Illinois law fails. "The primary issue underlying both an excessive force and battery claims is whether the force used by police was objectively reasonable under the circumstances . . . If the force used was objectively reasonable, then both claims are barred." *Rebolar ex rel. Rebolar v. City of Chi., Ill.*, 897 F. Supp. 2d 723, 741-42 (N.D. Ill. 2012) (internal citations omitted). Moreover, the Illinois Local Governmental and Governmental Employees Tort Immunity Act (Act) precludes the battery claim from proceeding here. The Act "grants public employees immunity from liability for any 'act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.'" *Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018) (quoting 745 ILL. COMP. STAT. 10/2-202). The effect of all this is that the Plaintiff's Illinois state law claim of indemnification against Defendant City of Peoria falls as well.

## IV

For the reasons set forth *supra*, Defendants Kyle Cruz, Ross Harr, and the City of Peoria's Motion for Summary Judgment (D. 21) is GRANTED. Summary judgment is entered as to all five counts of Plaintiff Jessica Coyle's First Amended Complaint (D. 18). The Clerk is directed to enter judgment in favor of all three Defendants on all of the Plaintiff's claims and close this case.

*It is so ordered.*

Entered on September 16, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE